
FILED
2017 Jul-24  PM 01:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

| | |
|---|---|
| **ROBIN ZAK ARMSTRONG;** ) | |
| **TIMOTHY-BRIAN ARMSTRONG,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No.: 4:16-CV-1065-VEH** |
| ) | |
| **CITY OF BOAZ, ET AL.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION

Plaintiffs Robin Zak Armstrong and Timothy-Brian Armstrong (together, "the Armstrongs"), who are proceeding *pro se*, initiated this action on June 30, 2016, asserting numerous state and federal claims relating to their arrests and subsequent detentions after being stopped at a driver's license checkpoint. Currently pending before the Court is Defendants'[1] Motion To Dismiss (doc. 51, the "Motion") the claims asserted by Plaintiffs in their Third Amended Complaint (doc. 46, the "Amended Complaint"). On April 10, 2017, the Armstrongs responded, and on April 19, 2017, the Defendants filed their reply. (Docs. 64, 66).

---

[1]  The term "Defendants" includes the City of Boaz, Michael Hempel ("Captain Hempel"), Brandon Hester ("Officer Hester"), and Quentin Scott ("Officer Scott").

The Motion is now ripe for the Court's disposition, and after careful review, the Court finds that it is due to be **GRANTED in part** and **DENIED in part**.

## II.    STANDARD OF REVIEW

The Federal Rules of Civil Procedure require only that the complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Still, the complaint must include enough facts "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Pleadings that contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards, nor do pleadings suffice that are based merely upon "labels and conclusions" or "naked assertion[s]" without supporting factual allegations. *Twombly*, 550 U.S. at 555, 557. In deciding a Rule 12(b)(6) motion to dismiss, courts view the allegations in the complaint in the light most favorable to the nonmoving party. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007).

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although "[t]he plausibility standard

is not akin to a 'probability requirement,'" the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id*. A plausible claim for relief requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claim. *Twombly*, 550 U.S. at 556.

After *Iqbal*, which applied the *Twombly* pleading standard in a civil rights context, "there is no longer a 'heightened pleading' standard in 'cases governed by Rule 8(a)(2), including civil rights [cases]' under § 1983." *Saunders v. Duke*, 766 F.3d 1262, 1266 (11th Cir. 2014) (quoting *Randall v. Scott*, 610 F.3d 701, 710 (11th Cir. 2010)). The Supreme Court has recently identified "two working principles" for a district court to use in applying the facial plausibility standard. First, in evaluating motions to dismiss, the Court must assume the veracity of well-pleaded factual allegations; however, the Court does not have to accept as true legal conclusions when they are "couched as . . . factual allegation[s]." *Iqbal*, 556 U.S. at 678. Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679.

Application of the facial plausibility standard involves two steps. Under prong one, the Court must determine the scope and nature of the factual allegations that are well-pleaded and assume their veracity; and under prong two, the Court must proceed to determine the claim's plausibility given the well-

3

pleaded facts. That task is context specific and, to survive the motion, the allegations must permit the Court based on its "judicial experience and common sense . . . to infer more than the mere possibility of misconduct." *Id.* If the Court determines that well-pleaded facts, accepted as true, do not state a claim that is plausible, the claims are due to be dismissed. *Id.*

Nevertheless, "*pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys, and will, therefore, be liberally construed." *Hughes v. Lott*, 350 F.3d 1157, 1160 (11th Cir. 2003) (citation omitted). Therefore, "wildly implausible allegations in the complaint should not be taken to be true, but the court ought not penalize the litigant for linguistic imprecision in the more plausible allegations." *Miller v. Donald*, 541 F.3d 1091 (11th Cir. 2008).

## III.   FACTUAL ALLEGATIONS

Because Defendants argue at least in part for dismissal based on the legal insufficiency of the Armstrongs' factual allegations, the Court sets out those allegations in their entirety rather than providing a summary of the facts pled.[2] The Armstrongs set out the following individual sets of factual allegations in their Amended Complaint:

---

[2] The Court has set out the allegations verbatim, including punctuation, capitalization, spelling, and brackets.

## A.   Robin Zak Armstrong's Allegations

1.   On or about the twenty eighth day of May, the year two thousand sixteen, i Robin was [traveling] in my property along the public way when we stopped so as not to cause harm to fellow-man who was standing in the roadway;

2.   i Robin, heard the man Michael [Hempel] say he stopped us to check the "driver license" of the man (Timothy-Brian) who was in control of the property;

3.   i Robin, heard the man Timothy-Brian did say that he was man in his private capacity and that he was not using the public roads for any commercial activity;

4.   during the event, i Robin activated a video recorder to record the events;

5.   i Robin believe that i acted as [a member of the independent] press by recording and reporting "public officials" engaged in "public duties";

6.   At NO time was i Robin or [my] property engaged in any "regulable activity" and no evidence to the contrary has been presented;

7.   At NO time was private property (farm truck) used as a "motor vehicle";

8.   At NO time did i, Robin, act as a "passenger" and no evidence has been presented to the contrary;

9.   At NO time did i Robin, knowingly or willingly waive any right;

10.   i Robin witnessed Michael [Hempel] threaten (promise) the man Timothy-Brian with arrest if he did not provide [commercial] documents.

11.   i saw several man in uniform near our property, two of which identified themselves (upon my request) as "Dake" and "Scott";

12.   i witnessed Timothy-Brian tell Michael that he was reaching into his back pocket [to get a driver license out of his wallet], but Michael refused to allow

Timothy-Brian to fulfill the order;

13.    i witnessed Michael [Hempel] open the door of the truck, without consent, unbuckle Timothy-Brian's seatbelt, and force him out of the property by twisting his arm and pulling him out;

14.    At NO time did Michael [Hempel] provide for inspection, a warrant granting him access to private property;

15.    After Timothy-Brian was taken, Michael began to interrogate me, to which i replied that i reserve my right to remain silent;

16.    Michael said my property (truck) was being towed and ordered me to get out;

17.    Michael [Hempel] told me that it was "too late" for me to show a driver license and he ordered i to abandon my truck (property);

18.    out of concern for my safety, i said i will comply with all orders;

19.    i gathered my belongings into my handbag (including the video camera) and exited the property;

20.    After i fulfilled Michael's order to abandon my property (truck), i was grabbed by another man acting as officer (Dake) and was told that i was under arrest;

21.    The man Justin [Dake] grabbed my arms and put my hands behind my back and put handcuffs around my wrists, causing pain and injury;

22.    i told Michael [Hempel] that my property (handbag) is private;

23.    Michael [Hempel] did arrest/punish me AFTER i reserved my right to remain silent;

24.    At no time did Michael [Hempel] (or any man who acted as 'officer') advise i of rights [cf Miranda v. Arizona];

25.    At no time was i informed by Michael what "government operation" i allegedly

obstructed;

26. i and my property (handbag) were taken by the man Jeff [Pitts] to the BOAZ Police station. Jeff said I satisfactorily fulfilled his orders;

27. While at the BOAZ jail, i did reserve all rights in the presence of the man Brandon [Hester] and said it is not my wish to answer questions or provide identification property (photos, fingerprints);

28. i said to Brandon [Hester] that i require to go immediately to a magistrate, however Brandon did deny that right and said that i would have to wait until Tuesday (approximately 72 hours) until i would be taken before a magistrate.

29. At BOAZ jail, Michael [Hempel] did search my property (handbag) and did take my property (camera with video evidence of the events and medication) without [my] consent and without warrant.

30. Said property has not been restored to this day;

31. i said to Brandon [Hester] that i wished to speak with Timothy-Brian (the man i appointed as counsel), but this right to counsel was also denied;

32. i was locked in a room for about two hours, then Brandon [Hester] came to the room and did say to me, that he would allow [my] freedom only AFTER taking identity property (photos, fingerprints, health information) AND [ransom] payment of five hundred thirty five dollars;

33. Brandon [Hester] did interrogate i Robin, without presence of counsel;

34. under threat and duress i did submit to Brandon's questions;

35. under threat and duress i Robin did pay the [ransom] fee in order to [re]gain freedom.

(Doc. 46 at 11-14) (quotations, emphasis, brackets, and alterations in original).

### B.   Timothy-Brian Armstrong's Allegations

1.  On or about 28 May, 2016 i, Timothy-Brian, was moving my property (farm truck) upon the common way;

2.  At no time during this event was i or my property engaged in any regulable activity and no evidence to the contrary has ever been presented;

3.  At no time during this event was my property used as a "Motor Vehicle" and no evidence to the contrary has ever been presented;

4.  i did ask Michael [Hempel] if he understood the distinction between the private use of the public roads and the commercial use of the public roads, he was unable to respond;

5.  Michael stated that while operating a Motor Vehicle on public roads, you must have your drivers license with you; i instructed Michael that those are commercial terms that he is using and the drivers license is a commercial document;

6.  At no time leading up to this event was i or my property engaged in any activity that rose to the level of "crime" and no evidence to the contrary has ever been presented;

7.  At no time during this event did Michael present any lawful requiring i to give enough identifying information so it could be determined if i had a valid drivers license;

8.  At no time during this event did Michael present any lawful requirement requiring i to step out of my Vehicle;

9.  At no time did i knowingly or willingly waive any right;;

10.  Michael stated that i was being detained to verify that i had a Drivers License;

11.  Michael [Hempel] returned with Quentin [Scott] and Justin [Dake] to surround the left door of the truck in a threatening show of force and stated - that if i did not wish to give him my information for the citation, i would be arrested and

would have to bond out on the charge;

12.   After turning to consult with Robin and out of concern for my safety i instructed Michael that i was reaching into my back pocket to get my wallet to retrieve a drivers license; Michael did refuse my offer to show a drivers license and stated - its too late for that, now you need to get out of the truck;

13.   Michael, without presenting a warrant and without my consent, did open the truck door, put hands on my left arm or wrist and twisted my arm to force compliance with his request while i was still belted into truck;

14.   i stated to all present that i had an injured, left, shoulder and i wished easy treatment;

15.   Michael, assisted by Quentin and Justin pulled me from my property (truck), placed me in handcuffs, searched my body and seized property without a warrant and without my consent;

16.   Michael placed me in arrest for the alleged offense of Obstructing a Governmental Operation; i immediately instructed Robin to go home, then come get me;

17.   upon hearing my instructions to Robin, Michael immediately stated that the truck was to be towed;

18.   at no point during or after the arrest was i advised of my right(s); at no point after the arrest was i given an election to go directly to a magistrate;

19.   Michael directed Quentin to take charge of my arrest and place me on the back seat of a police vehicle;

20.   i observed Robin exit the far side of my truck, have her property placed on the bed of my truck, get handcuffed and walk to a police vehicle;

21.   Quentin, continued with my arrest and transported i to CITY OF BOAZ jail;

22.   during the transport i instructed Quentin that i require to go directly to a

9

magistrate; Quentin replied, that would likely not be possible before Tuesday (3 days future), i questioned, are not the courts of Alabama open to the people 24/7?, that is my requirement;

23.    i was held at CITY OF BOAZ jail some amount of time in a cage, then in another room where Brandon Hester and Justin Dunn threatened to continue the restraint of my liberty (harm) unless i agreed to further "takings" of my property (personal information, finger prints, photographic images) and payment (financial property) for my release;

24.    i said to Brandon Hester that i require the charging instrument that was issued to effect my arrest Brandon Hester replied that no warrant issued, the arrest was on Complaint;

25.    under continued duress and threat of continued harm, without a hearing, without due process and without my consent a further "takings" (robbery) was effected;

26.    i was relocated back to a cage until such time as payment was made in exchange for my freedom.

(Doc. 46 at 15-17) (quotations, brackets, and alterations in original).

## C.    <u>Arrest Narrative</u>

In addition to pleading the above factual allegations, the Armstrongs attached an arrest narrative, written by Captain Hempel subsequent to their arrests, to the body of the Amended Complaint. (*Id.* at 34-35). The arrest narrative states as follows:

I Capt. Hempel, along with Sgt. Dake, Ptl. Pitts, Ptl. Scott and Dekalb County Deputy Andy [*illegible*] were conducting a driver's license checkpoint on Double Bridges Rd at the intersection of County Rd 1 in the city limits of Boaz. I observed a white Ford truck traveling east on

10

Double Bridges Rd approaching our checkpoint. The truck stopped and I initiated contact with the driver, later identified as Brian Timothy Armstrong. I informed Brian Armstrong that we were conducting a driver's license checkpoint and that I needed to see his driver's license. He responded something to the affect [sic] of "I only carry that for commercial purposes". I asked him again for his license and he repeated a statement similar to the first. At that point I realized that I may be dealing with a sovereign citizen and activated my body-worn camera.

I asked Brian Armstrong if he would give me his Social Security number and he stated that he did not have one. I then asked him what his name was. He responded "Armstrong". I asked him what his first name was and he replied "Timothy". I asked him for his date of birth and he stated that he would rather not give me that information. At that point I walked to the rear of the truck to retrieve the tag number. At this time I also noticed an equipment violation on the vehicle. One of the 2 right rear tires was slick, not meeting the tread depth requirements. When I did, I re-approached the driver and informed him that I was detaining him until I could verify that he had a valid driver's license. I went back to my vehicle and ran the tag number hoping that it would come back registered to a "Timothy Armstrong" so that I could go ahead and verify the driver's license status. It was registered under the name Robert Williams.

I then re-approached the driver and informed him that based on the information that he had provided to me, I could not confirm that he had a valid Alabama driver's license and I asked him how we were going to rectify that situation and he began to tell me that his license was for "commercial use of the roadway" and that he did not want to give me any false information. He then stated again that he was not using the roadway in a "commercial capacity." I informed him that while operating a motor vehicle on the roadway he was required to have his driver's license. Then he stated "this was private property." He then said the "truck was private property." At this time I informed Brian Armstrong that if he did not wish to give me his information for the citation he would be arrested and would have to bond out on the charge.

The female passenger then stated "that sounds like a threat". She was recording with a hand held digital video camera. I told her it was more like a promise. She then asked me for my name and I told her she would get it. I asked her what her name was and she said "you can call me Nana". I then asked the driver out of the vehicle. He stated "well hold on a minute". At this point I was getting concerned that he may have a weapon on him. He asked me to let him reach into his right hand pocked [sic] and retrieve his wallet. I told him that I would rather him not reach for anything and asked him to exit the vehicle a second time. He again refused so [sic] informed him that he could get out of the vehicle or I could take him out. He then stated "well, hold on a second here". I opened his driver door and again told him to get out. He stated again "hang on a second". He then stated "if you would just let me explain...." and I told him that we were finished explaining that we were not there to play games. I grabbed his left arm/wrist. He was still seat belted in. He then told me that he did have a handgun on his right hip. I reached across him and unbuckled his seat belt and helped him out of the vehicle.

I handcuffed Brian Armstrong behind his back and double locked the cuffs. He stated "well if you will just let me talk to you for [sic] second" and I told him that at this point we were finished talking. He informed me that he had a dislocated left shoulder and to be easy on him. He then stated "now I let you know that I am a man operating in my private capacity, which I am required to do", "because I don't want you guys to get yourselves in any trouble", "I'm just trying to protect you guys too".

I patted him down for more weapons and removed his wallet from his back pocket to locate some form of identification. I located what he referred to as a "private identification", an expired Etowah County pistol permit (exp. 2014) and an Alabama Driver's License, which he referred to as his "commercial identification". It was at this time I positively identified him as Brian Timothy Armstrong. I removed those 3 items from his wallet and placed his wallet back into his pants pocket. The pistol did have a round in the chamber and he did have an extra magazine.

Because the female passenger was still sitting in the truck I asked him if there were anymore [sic] firearms in the truck. He stated that was the only one he had. When I asked him again more specifically about inside the truck he stated that he did not know if she had one. At that time I placed Brian Armstrong under arrest for obstructing a government operation. I instructed Officer Scott to place Brian Armstrong in the back seat of his patrol car.

I then asked the female passenger if she had a valid driver's license so that I could let her drive off. She was still filming and just kept saying "what operation is that". At that time I called for a wrecker to impound the vehicle. At this point Brian had not yet been placed in Officer Scott's patrol car and he tried to tell her to just take the truck home. At this time I reached in the vehicle and got the keys from the ignition switch and she put her hand on top of mine and tried to prevent me from moving them. She stated it was her private property. At this time myself and Sgt. Dake ordered her out of the vehicle. She kept asking if we were ordering her to abandon her property. At this Brian stepped forth again and told her to "just call someone to come get her, that's it". She then asked why she could not drive the vehicle. We told her because she did not provide us with a valid driver's license. She then asked "and if I do?". We told her it was too late, that the tow truck was already on the way. Still not getting out of the truck, she then asked who would be liable for the bill. I told her yet again to step out of the truck. She then started gathering belongings into her purse, which we let her do. After she collected her belongings she was placed into handcuffs and detained until we could identify her.

Sgt. Dake [had] a small problem getting her handcuffs on her correctly because she was fidgeting. I then asked her if she had any identification in her purse. She stated that she had personal information in the purse. I then asked her if I could get her information out of her purse and she stated "if you order me to allow to". At that time I also arrested [her] for obstructing a governmental operation. The vehicle was impounded by Autow's Towing.

Once at the Boaz city jail I searched the passenger's purse. She was

13

identified as Robin Zak Armstrong. Inside of her purse I also found a couple [of] pill bottles containing several different pills in each. Those were collected as evidence. I also informed her that her digital movie camera would also be logged into evidence [si]nce it contained video evidence of the arrests. I was unable to identify the pills until after Robin Armstrong had already posted bond. Nine of the pills in a Motrin PM bottle were identified as prescription only Metaxalone 800mg. A warrant will be obtained for her arrest on the charge of illegal possession of prescription drugs.

Mrs. Armstrong was not cooperative at all with the booking process. I had to remove her glasses, a bandana, and a ring from her person. She did not resist physically, but just would not do anything voluntarily or answer any questions for co [sic] Brandon Hester. I also charged Brian Armstrong with possession of a concealed weapon without a permit because his pistol permit was expired in 2014. Both subjects bonded out by posting a cash bond. I also issued Brian Armstrong a traffic citation for the improper tire. I will have investigations obtain a search warrant for the data on the digital video camera.

(Doc. 46 at 34-35) (paragraph breaks and brackets supplied).

Because Plaintiffs themselves included the arrest narrative in the body of their pleading, the Court will treat this narrative as part of the Amended Complaint and will consider these factual allegations as true for the purposes of this Motion. *See Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2001) (in considering a motion to dismiss, "the court limits its consideration to the pleadings and exhibits attached thereto") (internal citation omitted). As the Eleventh Circuit has explained,

Our duty to accept the facts in the complaint as true does not require us

14

> to ignore specific factual details of the pleading in favor of general or conclusory allegations. <u>Indeed, when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern</u>. *See Associated Builders, Inc. v. Ala. Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974) ("Conclusory allegations and unwarranted deductions of fact are not admitted as true, <u>especially when such conclusions are contradicted by facts disclosed by a document appended to the complaint</u>. If the appended document, to be treated as part of the complaint for all purposes under Rule 10(c), Fed. R. Civ. P., reveals facts which foreclose recovery as a matter of law, dismissal is appropriate." (citation omitted)); *Simmons*, 113 F.2d at 813 ("Where there is a conflict between allegations in a pleading and exhibits thereto, it is well settled that the exhibits control.").

*Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205-06 (11th Cir. 2007) (emphasis supplied). Therefore, not only will the facts stated in the arrest narrative be treated as factual allegations asserted in a pleading, the arrest narrative will control in any situation where those allegations contradict any general or conclusory assertions made by Plaintiffs.

## IV.   ANALYSIS

Plaintiffs' Amended Complaint is based primarily on 42 U.S.C. §1983. They allege that their arrests were without probable cause and that their persons and property were seized in violation of their constitutional rights. They also claim that their right to be taken to a magistrate was violated, that they were unlawfully booked into jail, and that the City of Boaz should be held liable for its unlawful policies or customs and for failing to properly train its employees.

Construed liberally, they assert the following causes of action in connection with their arrest and subsequent temporary detention:

Count 1:      Robin Zak Armstrong's unlawful stop claim against Captain Hempel, brought pursuant to the Fourth and Fifth Amendments and the Alabama Constitution (doc. 46 at 18-19);

Count 2:      Robin Zak Armstrong's claim against Captain Hempel for the seizure and impoundment of the vehicle, brought pursuant to the Fourth and Fifth Amendments and the Alabama Constitution (*id.* at 19-20);

Count 3:      Robin Zak Armstrong's search and seizure claim against Captain Hempel, brought pursuant to the Fourth and Fifth Amendments and the Alabama Constitution (*id.* at 20-21);

Count 4:      Robin Zak Armstrong's claim against Captain Hempel for the seizure of her video camera, brought pursuant to the First Amendment and the Alabama Constitution (*id.* at 21-22);

Count 5:      Robin Zak Armstrong's claim against Captain Hempel for the seizure and retention of prescription medication, brought pursuant to the Fourth and Fifth Amendments and the Alabama Constitution (*id.* at 22-23);

Count 6:      Robin Zak Armstrong's claim against Captain Hempel for the seizure and retention of her video camera, brought pursuant to the Fourth and Fifth Amendments and the Alabama Constitution (*id.* at 23-24);

Count 7:      Robin Zak Armstrong's claim against Officer Hester for "deprivation of right to [be] taken to magistrate" pursuant to the Fifth, Sixth, and Ninth Amendments (*id.* at 24-25);

Count 8:      Robin Zak Armstrong's claim against Officer Hester for unlawful booking pursuant to the Fourth, Fifth, and Ninth Amendments (*id.*

16

at 25-26);

Count 9:     Robin Zak Armstrong's claim against the City of Boaz for failure
             to train and failure to enact or enforce policy pursuant to the
             Fourth, Fifth, and Ninth Amendments (*id.* at 26-27);

Count 10:    Timothy-Brian Armstrong's claim against Captain Hempel for
             unlawful stop pursuant to the Fifth Amendment (*id.* at 28-29);

Count 11:    Timothy-Brian Armstrong's claim against Captain Hempel for
             Search and Seizure, False Arrest, and False Imprisonment brought
             pursuant to the Fourth and Fifth Amendments (*id.* at 29-30);

Count 12:    Timothy-Brian Armstrong's claim against Quentin Scott for
             "deprivation of right to be taken to magistrate" brought pursuant
             to the Fifth, Sixth, and Ninth Amendments (*id.* at 30-31).

## A.     Ms. Armstrong's Claims Against the City of Boaz

In Count Nine, Ms. Armstrong[3] raises two Section 1983 claims against the

City of Boaz - a claim for failure to train and a claim for failure to enact or enforce

policy. First, Ms. Armstrong appears to allege that the City of Boaz should be held

liable for the actions of its employees through the theory of *respondeat superior*.

However, the law is well settled that a municipality cannot be held liable under 42

---

[3] Mr. Armstrong has not asserted a cause of action against the City of Boaz. In Count
Ten, which is asserted against Captain Hempel, he briefly claims that Captain Hempel
"demonstrated a lack of proper training and supervision." (Doc. 46 at 28). In Count 12, which is
asserted against Officer Scott, Mr. Armstrong claims that Officer Scott's refusal to immediately
take him to a magistrate "demonstrates a lack of proper training and supervision by another
officer of the same department and when looked at on a larger scale, may be reflective of a policy
of abuse." (*Id.* at 31). However, as Mr. Armstrong has not independently asserted a cause of
action against the City, these claims are insufficient to put the City on notice of any purported
claim by Mr. Armstrong and are, therefore, due to be **DISMISSED**.

U.S.C. § 1983 under a theory of *respondeat superior*, meaning that "a municipality cannot be held liable *solely* because it employs a tortfeasor[.]" *Monell v. Dept. of Social Services of New York*, 436 U.S. 658, 691, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978) (emphasis in original).

Rather, before a municipality can be held accountable for the conduct of a police officer, a plaintiff must show that the execution of the local government's "policy" or "custom" was the cause of the injury. *Id.* at 694. In other words, "[a] local government may be held liable under § 1983 only for acts for which it is actually responsible, 'acts which the [local government] has officially sanctioned or ordered.'" *Turquitt v. Jefferson Cnty.*, 137 F.3d 1285, 1287 (11th Cir. 1998) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986)).

One way to establish official municipal policy in the context of challenged police action is through deficient officer training. In *City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989), the Supreme Court acknowledged that "there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability in § 1983[,]" and held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." 489 U.S. at 388, 109 S. Ct. at

1204. In other words, the deliberate indifference standard requires a conscious choice on the part of a municipality before it "can . . . be properly thought of as a 'policy or custom' that is actionable under § 1983." 489 U.S. at 389, 109 S. Ct. at 1205. The individual shortcomings of a police officer or even the negligent administration of an "otherwise sound program" are insufficient grounds for maintaining a § 1983 municipal claim. *Canton*, 489 U.S. at 390, 109 S. Ct. at 1206.

In addressing the failure to train as a custom or policy under § 1983, the Eleventh Circuit has clarified:

> Only when the failure to train amounts to "deliberate indifference" can it properly be characterized as the "policy" or "custom" that is necessary for section 1983 liability to attach. *City of Canton*, 489 U.S. at 389, 109 S. Ct. at 1205. Failure to train can amount to deliberate indifference when the need for more or different training is obvious, *id.* at 390, 109 S. Ct. at 1205, such as when there exists a history of abuse by subordinates that has put the supervisor [or municipality] on notice of the need for corrective measures, *Greason*, 891 F.2d at 837, and when the failure to train is likely to result in the violation of a constitutional right, *City of Canton*, 489 U.S. at 390, 109 S. Ct. at 1205.

*Belcher v. City of Foley*, 30 F.3d 1390, 1397-98 (11th Cir. 1994). To sustain a claim for a failure to train, Plaintiffs must plead facts showing "that it was *so* predictable that failing to train the [officers] amounted to [a] *conscious disregard* for [their constitutional] rights." *Connick v. Thompson*, 563 U.S. 51, 71, 131 S. Ct.

19

1350, 1365, 179 L. Ed. 2d 417 (2011) (emphasis in original).

Rather than pleading factual allegations to support either a failure to enact or enforce policy or a failure to train claim against the City, Ms. Armstrong has merely stated theories of liability. For example, she alleges that "the wrongs done to the aggrieved were done by those who acted on behalf of and for the benefit of the 'CITY OF BOAZ', and the aggrieved believes that said wrongs [under color of law] are evidence of: (i) policies that those employed by the CITY OF BOAZ are responsible to follow; (ii) failure to properly train employees on their duty to protect the rights of the public whom they serve[.]" (Doc. 46 at 26).

Ms. Armstrong has not pointed to any specific policy or custom that the City of Boaz had in place at the time of the checkpoint and their arrests. There are no factual allegations in the Amended Complaint supporting her contention that an official City policy or unofficial custom was the driving force behind the allegedly unconstitutional actions of the individual officers. She does not reference, for example, any documented history of meritorious claims of unconstitutional actions by Captain Hempel, Officer Hester, or Officer Scott (the "Defendant Officers") specifically or by any other City of Boaz police officers more generally. Ms. Armstrong has also failed to allege that the City's training of the Defendant Officers had any impact on their behaviors. In fact, she fails to allege anything

20

relating to the City of Boaz's training programs with any specificity. Her only contention is that Officer Scott and Officer Hester's refusal to take them to a magistrate "indicates improper training and a police policy," (doc. 46 at 27), but she has failed to demonstrate that their actions were anything more than individualized shortcomings or negligence, if that.

Ms. Armstrong's efforts to show an actionable municipal policy or custom are too inadequate, vague, and conclusory to defeat Defendants' Motion. *See Twombly*, 550 U.S. at 561 (pleadings that merely leave "open the possibility that a plaintiff might later establish some sort of undisclosed facts to support recovery" are insufficient to withstand a motion to dismiss). Accordingly, Defendants' Motion To Dismiss the claims against the City of Boaz in the Amended Complaint is due to be **GRANTED**. Further, as no additional claims were brought against the City of Boaz, it is due to be **TERMINATED** as a party defendant.

## B.   Plaintiffs' Federal Claims Against Defendant Officers in Their Official Capacities

Plaintiffs attempt to bring claims against the Defendant Officers in both their individual and official capacities. (Doc. 46 at 10). However, their "official capacity" Section 1983 claims are actually claims against the City of Boaz. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a

state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office" that is "no different from a suit against the State itself."); *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (Suits against officers in their official capacities are, "in all respects other than name . . . treated as a suit against the entity"); *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) ("Because suits against a municipal officer sued in his official capacity and direct suits are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly[.]").

Accordingly, Plaintiffs' official capacity claims against the Defendant Officers are duplicative of their claims brought against the City of Boaz, which the Court has already addressed. Therefore, Defendants' Motion is due to be **GRANTED** as to Plaintiffs' official capacity claims against the Defendant Officers, which are due to be **DISMISSED WITH PREJUDICE**.

### C.    Plaintiffs' Federal Claims Against Defendant Officers in Their Individual Capacities

#### 1.    *Claims Brought Pursuant to 18 U.S.C. §§ 241 and 242*

Plaintiffs cite routinely to 18 U.S.C. §§ 241 and 242 throughout their Amended Complaint. However, these statutes are both federal criminal statutes.

22

More specifically, § 241 criminalizes conduct that constitutes a conspiracy against

rights and states:

> If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or
>
> If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured--
>
> <u>They shall be fined under this title or imprisoned not more than ten years, or both</u>; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, <u>they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death</u>.

18 U.S.C. § 241 (emphases added).

Section 242 criminalizes conduct which constitutes a deprivation of rights

under color of law and provides:

> Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, <u>shall be fined under this title or imprisoned not more than one year, or both</u>; and if bodily injury results from the acts committed in violation of this

section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, <u>shall be fined under this title or imprisoned not more than ten years, or both</u>; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, <u>shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death</u>.

18 U.S.C. § 242 (emphases added).

As neither one of these <u>criminal</u> statutes supports a claim for <u>civil</u> liability (of any kind), the Motion is due to be **GRANTED** as to any claim for relief tied to these two inapplicable statutes.

### 2.    *Fifth Amendment Claims Against Defendant Officers*

Throughout the Amended Complaint, Plaintiffs assert causes of action pursuant to the Fifth Amendment. However, the Fifth Amendment limits the powers of the federal government, not the states. *See Jordan v. Mosley*, 298 F. App'x 803, 806 n. 5 (11th Cir. 2008) ("Jordan also cites the Fifth Amendment; but as the district court correctly determined, the Fifth Amendment applies only to Federal, not state, acts."); *Riley v. Camp*, 130 F.3d 958, 972 n.19 (11th Cir. 1997) (noting that "[t]he Fifth Amendment obviously does not apply here – the acts complained of were committed by state rather than federal officials"); *McCall v. Dep't of Human Resources*, 176 F. Supp. 2d 1355, 1363 (M.D. Ga. 2001) ("[It] is

24

elementary constitutional law that the Due Process Clause of the Fifth Amendment

applies only to conduct committed by officials of the federal government; it does

not apply to state actors."). Though the Due Process Clause of the Fourteenth

Amendment applies to state actors, Plaintiffs have not alleged any due process

violations pursuant to the Fourteenth Amendment in their Amended Complaint.[4]

    Furthermore, to the extent that Plaintiffs claim in the Amended Complaint

that their Fourteenth Amendment rights were violated, these claims are "redundant

of the rights guaranteed by the more specific Fourth Amendment" and are

cognizable only under that amendment. *Dorsey v. Wallace*, 134 F. Supp. 2d 1364,

1373-74 (N.D. Ga. 2000) (citing *Albright v. Oliver*, 510 U.S. 266, 114 S. Ct. 807,

127 L. Ed. 2d 114 (1994)) ("The Framers considered the mater of pretrial

deprivations of liberty, and drafted the Fourth Amendment to address it.")). As the

Supreme Court has recently clarified,

> pretrial detention can violate the Fourth Amendment not only when it
> precedes, but also when it follows, the start of legal process in a criminal

---

[4] For the first time in their response brief, Plaintiffs reference the Fourteenth Amendment. Even under more liberal *pro se* pleading standards, this is insufficient to put Defendants on notice when their pleading does not reference the Fourteenth Amendment at all, particularly since Plaintiffs were given two opportunities to amend their initial complaint. "A complaint may not be amended by briefs in opposition to a motion to dismiss." *Gibbons v. McBride*, 124 F. Supp. 3d 1342, 1381 (S.D. Ga. 2015); *see also Huls v Llabona*, 437 F. App'x 830, 832 n.5 (11th Cir. 2011) (an argument raised for the first time in response to a motion to dismiss, instead of in an amended complaint, was not properly raised before the district court and would not be considered on appeal).

case. The Fourth Amendment prohibits government officials from detaining a person in the absence of probable cause. *See supra*, at 917. That can happen when the police hold someone without any reason before the formal onset of a criminal proceeding. But it also can occur when legal process itself goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements. Then, too, a person is confined without constitutionally adequate justification. Legal process has gone forward, but it has done nothing to satisfy the Fourth Amendment's probable-cause requirement. And for that reason, it cannot extinguish the detainee's Fourth Amendment claim—or somehow, as the Seventh Circuit has held, convert that claim into one founded on the Due Process Clause. *See* 590 Fed. Appx., at 643–644. If the complaint is that a form of legal process resulted in pretrial detention unsupported by probable cause, then the right allegedly infringed lies in the Fourth Amendment.

*Manuel v. City of Joliet, Ill.*, __ U.S. __, 137 S. Ct. 911, 918, 197 L. Ed. 2d 312 (2017). Therefore, the constitutionality of Plaintiffs' arrest and detention by state officials is governed by the Fourth Amendment rather than by the Fourteenth Amendment's due process analysis.

As none of the Defendants in this action are federal actors, Plaintiffs have failed to state a plausible Fifth Amendment Claim. Accordingly, Defendants' Motion is due to be **GRANTED** as to any Fifth Amendment claims asserted by Plaintiffs. Further, to the extent Plantiffs have asserted Fourteenth Amendment due process claims relating to their arrests, these claims are duplicative of their Fourth Amendment claims and are also due to be **DISMISSED**.

### 3.   *Ninth Amendment Claims Against Defendant Officers*

Plaintiffs' apparent attempts to sustain claims under the Ninth Amendment in Counts Seven, Eight, Nine, and Twelve are equally unavailing. The Ninth Amendment guarantees only that "the enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const. amend. IX. However, it is well-established that

> the Ninth Amendment is not an independent source of constitutional rights and thus cannot provide the basis for a § 1983 claim. *See Hightower by Dahler v. Olmstead*, 959 F.Supp. 1549, 1557-58 (N.D. Ga. 1996), *aff'd sub nom, Hightower v. Olmstead*, 166 F.3d 351 (11th Cir. 1998) (Table); *Charles v. Brown*, 495 F.Supp. 862, 863-64 (N.D. Ala. 1980); *see also Metz v. McKinley*, 583 F. Supp. 683, 688 n.4 (S.D. Ga.) (noting same in a *Bivens* cause of action), *aff'd*, 747 F.2d 709 (11th Cir. 1985) (Table).

*Ayton v. Owens*, 2013 WL 4077995, at *5 n.5 (S.D. Ga. August 12, 2013); *see also Thomas v. Howze*, 2008 WL 2359750, at *4 (N.D. Fl. 2008) (granting a motion to dismiss conclusory Ninth Amendment-based claims because "the Ninth Amendment does not authorize civil rights claims nor does it independently secure any constitutional rights"). As such, the Ninth Amendment provides no basis for Plaintiffs' claims as pled. Defendant's Motion is due to be **GRANTED**, and Counts Seven, Eight, Nine, and Twelve are due to be **DISMISSED** to the extent that they assert claims pursuant to the Ninth Amendment.

### 4.    *Fourth Amendment Claims Against Defendant Officers*

The essence of Plaintiffs' case is that their arrests on May 28, 2016, were unlawful because they were without probable cause. Plaintiffs also claim that their detention and subsequent booking, and the seizure of their vehicle and other items, violated their Fourth Amendment rights to be free from unreasonable searches and seizures.[5] The Court will address each of their Fourth Amendment claims below.

### a.    Unlawful Stop

In Counts One and Ten, if construed liberally, both Plaintiffs assert claims against Captain Hempel challenging the legality of the driver's license checkpoint itself. (Doc. 46 at 18-19, 28-29). Defendants have moved to dismiss these claims on the basis that "there is no constitutional right to travel the public road without regulation, because driver's license checkpoints are lawful, and Alabama police officers have a statutory right to request and inspect a driver's operating license[.]" (Doc. 52 at 14).

In both the Amended Complaint and in their response brief, Plaintiffs do not dispute the existence of state and federal laws governing the operation of motor vehicles. *See*, *e.g.,* (Doc. 46 at 28) ("State and Federal Statutes governing the

---

[5]    *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.").

participation in highway and traffic safety programs, like Driver's License

Checkpoints, are expressly written to regulate 'Motor Vehicles used for

commercial purposes of the highways' and the 'drivers license' is issued for the

express purpose of 'operating' a 'motor vehicle' on the highways."). In fact, they

do not even dispute the constitutional validity of the traffic stop itself. *See* (Doc.

46 at 18) ("[T]he aggrieved agrees that Michael [Hempel] when acting as a public

officer, has legal authority to stop 'motor vehicles' and 'ask' for

documentation[.]"); (Doc. 64 at 5) (acknowledging that the checkpoint "**may** have

been 'valid' for 'drivers' of 'motor vehicles' that are engaged in commercial use,

transportation, or other services for compensation, upon the roads") (emphasis in

original).

      Instead, Plaintiffs mistakenly believe that the laws of the road - here,

Alabama's motor vehicle laws - do not apply to them. Plaintiffs dispute that they

were operating a "motor vehicle" (doc. 64 at 6) and argue that they were not

engaged in "commercial" activity, so Caption Hempel "misapplied the law

intended for commercial traffic" when he stopped their truck. (Doc. 46 at 18). The

Court disagrees.

      The constitutional rights upon which Plaintiffs rely do not come without

limitations, including those restrictions imposed by state motor vehicle laws. The

right to interstate travel

> does not include the unregulated use of the state's highways. While a
> state cannot penalize a citizen for exercising his right to travel between
> states, *see Jones v. Helms*, 452 U.S. 412, 419, 101 S.Ct. 2434, 2440, 69
> L.Ed.2d 118 (1981), a state may regulate its public highways and may
> impose reasonable regulations for securing the safety of the travelers
> using those highways. *Hendrick v. Maryland*, 235 U.S. 610, 622, 35
> S.Ct. 140, 142, 59 L.Ed. 385 (1915) (holding that it is an acceptable
> exercise of a state's police power to require licensing of their drivers and
> registering of vehicles, and to charge a reasonable fee to implement
> these requirements). *See R.T.M. v. State*, 677 So.2d 801, 804 (Ala. Cr.
> App.1995)(recognizing that the State of Alabama has the authority
> under its exercise of police power to regulate motor vehicles on public
> highways and to impose reasonable fees to implement that policy). *See
> also Lindsey v. Barton*, 260 Ala. 419, 70 So.2d 633 (1954); *Bozeman v.
> State*, 7 Ala. App. 151, 61 So. 604 (1913).

*Snavely v. City of Huntsville*, 785 So. 2d 1162, 1166 (Ala. Crim. App. 2000). For

example, under Alabama law, "[e]very person, except those specifically exempted

by statutory enactment, shall procure a driver's license before driving a motor

vehicle upon the highways of this state." Ala. Code § 32-6-1.

Alabama defines a "motor vehicle" as "[e]very vehicle which is self-

propelled," and defines vehicle as "[e]very device in, upon, or by which any

person or property is or may be transported or drawn[.]" Ala. Code. § 32-1.1 (32),

(81). Plaintiffs' truck is clearly a motor vehicle, and Plaintiffs themselves are

"persons" as defined by both state and federal law. *See* Ala. Code § 32-1-1.1(42)

("person" includes "natural persons"); 1 U.S.C. § 1 ("person" includes

"individuals").

Further, Plaintiffs do not dispute that the traffic stop occurred on public roads, and the arrest narrative attached to the Amended Complaint explicitly states that the driver's license checkpoint was conducted "on Double Bridges Rd at the intersection of County Rd 1 in the City Limits of Boaz." (Doc. 46 at 34). As Defendants have pointed out, Plaintiffs have not cited any rule or authority exempting a driver from possessing a driver's license or from following the rules of operating a "motor vehicle on a public roadway in Alabama, regardless of his or her purpose for traveling." (Doc. 66 at 4).

Regardless of any distinctions that Plaintiffs attempt to make between "private" and "commercial" activity or between their truck and "motor vehicles," the laws of the state of Alabama applied to Plaintiffs when they made the decision to drive a vehicle on Alabama's public roads. *See* Ala. Code § 32–5A–3 ("It is unlawful and, unless otherwise declared in this chapter with respect to particular offenses, it is a misdemeanor for any person to do any act forbidden or fail to perform any act required in this chapter."). Because these laws do in fact apply to Plaintiffs, they have failed to state a cause of action that their stop at the driver's license checkpoint was unlawful in its application to them. Accordingly, Defendants' Motion is due to be **GRANTED** to the extent Plaintiffs claim they

31

were unlawfully stopped at the checkpoint.

### b.    Section 1983 False Arrest

In Counts Three and Eleven, Plaintiffs have brought claims against Captain

Hempel for Section 1983 false arrest, without a warrant, in violation of the Fourth

Amendment protection against unreasonable searches and seizures. As another

court within this Circuit has recently explained,

> [w]hether a warrantless arrest of a person, which is a seizure, is
> reasonable depends on a finding of probable cause. *Kingsland v. City of
> Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004). That is, an arrest without
> a warrant and lacking probable cause violates the Constitution and can
> underpin a section 1983 claim, but the existence of probable cause at the
> time of arrest is an absolute bar to a subsequent constitutional challenge
> to the arrest. *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 (11th
> Cir. 2010); *Case v. Eslinger*, 555 F.3d 1317, 1326–27 (11th Cir. 2009).

*Bey v. Abrams*, 2015 WL 3839908, at *6 (N.D. Ala. June 22, 2015) (Proctor, J.);

*see also Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007) ("In Fourth

Amendment terminology, an arrest is a seizure of a person, and the

'reasonableness' of an arrest is, in turn, determined by the presence or absence of

probable cause for the arrest.") (internal citation omitted).

Probable cause exists "whenever an officer reasonably believes that an

offense is being committed." *Durruthy v. Pastor*, 351 F.3d 1080, 1090 (11th Cir.

2003); *see id.* at 1088 ("Although probable cause requires more than suspicion, it

does not require convincing proof, and need not reach the [same] standard of conclusiveness and probability as the facts necessary to support a conviction.") (citation and internal quotation marks omitted) (alterations in original, internal citation omitted). Plaintiffs have the "burden of demonstrating the absence of probable cause in order to succeed in [a] §1983 claim." *Rankin v. Evans*, 133 F.3d 1425, 1436 (11th Cir. 1998). "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

Because Captain Hempel did not have a warrant for either of Plaintiffs' arrests, he must show that their arrests were based on probable cause. Both Plaintiffs were charged with obstruction of governmental operations, which is defined under Alabama law as follows:

> a person commits the crime of obstructing governmental operations if, by means of intimidation, physical force or interference or by any other independently unlawful act, he: (1) [i]ntentionally obstructs, impairs or hinders the administration of law or other governmental function; or (2) [i]ntentionally prevents a public servant from performing a governmental function.[6]

---

[6] A "governmental function" is defined as "[a]ny activity which a public servant is legally authorized to undertake on behalf of a government or the fire control activities of a member of a volunteer fire department." Ala. Code § 13A-10-1(3) (1975) (2005 Replacement Vol.) (alteration supplied).

Ala. Code §13A–10–2.

As the driver of the vehicle, Mr. Armstrong was required to provide his driver's license to Captain Hempel upon request. *See* Ala. Code § 32–6–9 ("Every licensee shall have his or her license in his or her immediate possession at all times when driving a motor vehicle and shall display the same, upon demand of a judge of any court, a peace officer, or a state trooper."). Based on the facts as alleged by Plaintiffs in the arrest narrative attached to the Complaint, Mr. Armstrong failed to provide his driver's license several times upon request by Captain Hempel.[7]

Mr. Armstrong's refusal violated § 32-6-9 and interfered with the checkpoint pursuant to § 13A-10-2's "independently unlawful act" provision. Based on Mr. Armstrong's repeated failure to provide his driver's license upon request, the Court finds that Captain Hempel possessed probable cause to arrest Mr. Armstrong for obstructing a governmental operation. Accordingly, Mr. Armstrong's Section 1983 claim for false arrest is due to be **DISMISSED**.

---

[7]  Though Plaintiffs' brief attempts to refute that Mr. Armstrong failed to provide his driver's licenses upon demand, these protestations are undone by the facts pled in their own Amended Complaint. The arrest narrative attached to the Amended Complaint demonstrates otherwise and governs for the purposes of the pending Motion. *See Irvin*, 496 F.2d at 1206 (when factual allegations and exhibits attached to the complaint conflict, the allegations as stated in the exhibits control).

Ms. Armstrong, however, was not driving the vehicle, so her failure to present her driver's license upon request did not violate the same Alabama law. *See* Ala. Code §32-6-9 (requiring a licensee to have a license in possession "when <u>driving</u> a motor vehicle") (emphasis added). Furthermore, Defendants have not pointed to a different state law requiring that she provide a driver's license as a passenger; therefore, in order for there to be probable cause for her charge of obstruction of governmental operations, Ms. Armstrong must have intentionally obstructed the administration of law or prevented Captain Hempel from performing a governmental function either by means of (1) intimidation or (2) physical force or interference. *See* Ala. Code §13A–10–2.

Accepting Plaintiffs' version of events as true as stated in the arrest narrative, Ms. Armstrong physically tried to prevent Captain Hempel from towing their truck by restraining him as he tried to remove the keys from the engine. (*See* Doc. 46 at 35) (after calling for a wrecker to impound the vehicle, Captain Hempel "reached in the vehicle and got the keys from the ignition switch and she put her hand on top of [his] and tried to prevent [him] from moving them. She stated it was her private property"). As will be discussed in further detail below, the seizure and subsequent impoundment of Plaintiffs' vehicle was not unlawful and was in accord with Captain Hempel's duties as a municipal police officer. Accordingly,

35

Ms. Armstrong's attempts to physically prevent the vehicle's removal interfered with his lawful objective to tow the vehicle and conduct the checkpoint. *Cf. D.A.D.O. v. State*, 57 So.3d 798, 806 (2009) ("We hold that 13A–10–2 does require that the interference be *physical* interference and that words alone fail to provide culpability under § 13A–10–2. Under the express provisions of the statute, the interference would have to be, in part at least, physical in nature.") (emphasis in original).

Accordingly, the Court finds that Captain Hempel possessed probable cause to arrest Ms. Armstrong for obstructing a government operation under §13A–10–2 based on her physical interference with Captain Hempel's impoundment of the vehicle. As a result, Ms. Armstrong's Section 1983 claim for false arrest is also due to be **DISMISSED**.

The Court must also briefly address Ms. Armstrong's one-line contention in Count Three that her *Miranda* rights were violated. *See* (Doc. 46 at 20) ("[W]rongdoer never advised the aggrieved of her rights].]"). Allegations that a plaintiff's *Miranda* rights were violated, however, do not give rise to a cognizable claim under § 1983. *Wright v. Dodd*, 438 F. App'x 805, 807 (11th Cir. 2011). As the Eleventh Circuit has recently stated,

an allegation that officers failed to follow *Miranda* procedures is

36

> insufficient to "assert[ ] a violation of a constitutional right in order to state a cause of action under § 1983." *Jones v. Cannon*, 174 F.3d 1271, 1291 (11th Cir.1999) (internal quotation marks omitted). In *Jones*, we explained that the right to counsel during custodial interrogations recognized in *Miranda* was "merely a procedural safeguard, and not a substantive right." *Id.* (internal quotation marks omitted). Under this precedent, we must conclude that [the plaintiff] failed to state a claim under § 1983 because his allegation that the officers failed to follow *Miranda* procedures was <u>insufficient to assert that the officers violated his substantive constitutional rights</u>.

*Parris v. Taft*, 630 F. App'x 895, 901 (11th Cir. 2015) (emphasis added).

Similarly, Ms. Armstrong has failed to state a claim that her constitutional rights were violated on the basis of a failure to follow *Miranda* procedures.

For the above reasons, Defendants' Motion is due to be **GRANTED** as to both Plaintiffs' Section 1983 false arrest claims.

### c.      Section 1983 False Imprisonment

In addition to asserting Section 1983 claims for false arrest, Mr. Armstrong pursues a Section 1983 claim against Captain Hempel for false imprisonment. However, because his allegations are premised on allegations of a lack of probable cause, his false imprisonment claim fails for the same reasons as his Section 1983 false arrest claim.[8]

---

[8] Only Mr. Armstrong has explicitly brought a claim for false imprisonment. *See* (Doc. 46 at 29-30). However, to the extent that Ms. Armstrong also intended to bring a claim for false imprisonment pursuant to <u>federal</u> law, her claim is due to be **DISMISSED** for the same reasons.

"A Section 1983 false imprisonment claim must meet the elements of common law false imprisonment 'and establish that the imprisonment worked a violation of the Fourteenth Amendment due process rights.'" *West v. Tillman*, 2006 WL 2052520, at *7 (S.D. Ala. 2006) (citing *Cannon v. Macon Cty.*, 1 F.3d 1558, 1562-63 (11th Cir. 1993)). Under Alabama law, false imprisonment consists of "the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." Ala. Code. § 6-5-170 (1975); *see also Big B, Inc. v. Cottingham*, 634 So. 2d 999, 1001 (Ala. 1993). However, the absence of probable cause is a prerequisite of a false imprisonment claim. *Ortega* v. *Christian*, 85 F.3d 1521, 1526 (11th Cir. 1996) ("Where a police officer lacks probable cause to make an arrest, the arrestee has a claim under Section 1983 for false imprisonment based on a detention pursuant to that arrest.").

As this Court has already determined that probable cause existed to arrest both Plaintiffs without a warrant, Mr. Armstrong's false imprisonment claim based upon those arrests also fails and is, accordingly, due to be **DISMISSED**.

### d.    Impoundment of the Vehicle

In Count Two, Ms. Armstrong brings a search and seizure claim against Captain Hempel for the impoundment of the vehicle Mr. Armstrong was driving. As the Eleventh Circuit has explained,

> A police officer may impound and inventory a vehicle when he has acted pursuant to standard criteria or police procedures. *See Colorado v. Bertine*, 479 U.S. 367, 375–76, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987) (holding that officer's inventory of impounded van was permissible under the Fourth Amendment because it was done according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity); *South Dakota v. Opperman*, 428 U.S. 364, 376, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (holding that routine inventory search—pursuant to standard police procedures—of an automobile lawfully impounded by police for violations of municipal parking ordinances did not violate the Fourth Amendment); *United States v. Roberson*, 897 F.2d 1092, 1096–97 (11th Cir. 1990) (police officer's impoundment and inventory of car in accordance with standard police procedures was not unreasonable under the Fourth Amendment).

*United States v. Akinlade*, 519 F. App'x 529, 535 (11th Cir. 2013); *see also Colorado v. Bertine*, 479 U.S. 367, 374, 107 S. Ct. 738, 742, 94 L. Ed. 2d 739 (1987) (concluding that "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment").

Defendants  assert that Captain Hempel acted pursuant to lawful police procedures and in accordance with Alabama's impound statute, which states that "[a]ny police officer is hereby authorized to remove or cause to be removed . . . any vehicle found upon a highway when . . . [t]he person or persons in charge of such vehicle are unable to provide for its custody or removal."). Ala. Code § 32–5A–139(c)(2). Defendants also argue that the impoundment of the vehicle was justified because police officers have an "inherent authority to impound vehicles

as a caretaking function." (Doc. 66 at 5); *see Cannon v. State*, 601 So. 2d 1112, 1114 (Ala. Crim. App. 1992) (citing *Morton v. State*, 452 So. 2d 1361, 1365 (Ala. Crim. App. 1984)) ("[T]he police have an inherent authority to impound vehicles, aside from statutory authority[,] based on what is called the community caretaking function.").

Ms. Armstrong, in turn, has not asserted that Captain Hempel departed from standard police procedures or violated state law in impounding the vehicle. Her cursory allegations that Captain Hempel "robbed" Plaintiffs of their truck by ordering its abandonment or removal and, in doing so, violated their constitutional rights are insufficient to state a claim for relief. The arrest narrative demonstrates that Captain Hempel "asked the female passenger if she had a valid driver's license so that [he] could let her drive off," yet she refused to provide him with her license. (Doc. 46 at 35). After Mr. Armstrong was arrested, and after Ms. Armstrong did not provide a driver's license, neither Plaintiff could provide for the vehicle's "custody or removal." Furthermore, the arrest narrative states that the vehicle was not registered to either Plaintiff. The Court finds that under the facts as alleged in the Complaint, the vehicle was lawfully impounded by Captain Hempel pursuant to § 32–5A–139(c)(2).

As Plaintiffs have failed to state a claim that Captain Hempel acted contrary

to standard police procedures or violated state law in impounding the vehicle, Defendants' Motion is due to be **GRANTED** as to Ms. Armstrong's claims for the seizure and impoundment of the vehicle in Count Two, and those claims are due to be **DISMISSED**.

### e.     Seizure of Video Camera and Medication

In Counts Four and Six, Ms. Armstrong asserts claims related to the seizure of her video camera and her prescription medication after her arrest, which she claims violated her First, Fourth, and Fifth Amendment Rights. She also seeks relief for the continued retention of her video camera.

### i. Fourth Amendment Claims

The conclusion that Captain Hempel had probable cause to arrest Ms. Armstrong leads to the corollary that Captain Hempel had probable cause for the seizure of Ms. Armstrong's video camera and prescription medication because the government has a well-established right to search a person who has been lawfully arrested. As the Supreme Court has reemphasized,

> "The validity of the search of a person incident to a lawful arrest has been regarded as settled from its first enunciation, and has remained virtually unchallenged." *United States v. Robinson*, 414 U.S. 218, 224, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Even in that context, the Court has been clear that individual suspicion is not necessary, because "[t]he constitutionality of a search incident to an arrest does not depend on whether there is any indication that the person arrested possesses

41

weapons or evidence. The fact of a lawful arrest, standing alone, authorizes a search." *Michigan v. DeFillippo*, 443 U.S. 31, 35, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979).

*Maryland v. King*, 133 S. Ct. 1958, 1977, 186 L. Ed. 2d. 1 (2013) (internal citation omitted).

The facts as alleged in the arrest narrative state that, once at the Boaz city jail, Captain Hempel searched Ms. Armstrong's purse and found "a couple pill bottles containing several different pills in each. Those were collected as evidence. I also informed her that her digital movie camera would also be logged into evidence since it contained video evidence of the arrests." (Doc. 46 at 35). The arrest narrative then states that Captain Hempel was "unable to identify the pills until after Robin Armstrong had already posted bond. Nine of the pills in a Motrin PM bottle were identified as prescription only Metaxalone 800MG. A warrant will be obtained for her arrest on the charge of illegal possession of prescription drugs." *Id.* Despite Ms. Armstrong's arguments to the contrary, both the pill bottles and the video camera were obtained pursuant to a search incident to a lawful arrest. Accordingly, Ms. Armstrong's Fourth Amendment claims relating to the seizure of her video camera and prescription medication are due to be **DISMISSED**.

### ii. First Amendment Claims

42

In addition to her Fourth Amendment claims, Ms. Armstrong claims in Count Four that her First Amendment rights were violated by the seizure of her video camera. She alleges that her arrest was "for the purpose of confiscation of the evidence of the wrongs done by 'officers,'" which the Court construes as an assertion that she was retaliated against for asserting her First Amendment right to photograph police activities. (Doc. 46 at 21). As is the case with a majority of Plaintiffs' Amended Complaint, Ms. Armstrong fails to cite to any binding authority to support the plausibility of her claim. However, Defendants' Motion also cites to no relevant authority; in fact, their Motion makes no mention of her First Amendment-based allegations at all.

Based on this Court's independent research, the Eleventh Circuit has recognized a "First Amendment right, subject to reasonable time, manner, and place restrictions, to photograph or videotape police conduct." *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000). The First Amendment "protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest." *Id.* However, under Section 1983, a plaintiff must prove that the conduct complained of deprived him or her of "a right, privilege, or immunity secured by the constitution or laws of the United States." *Id.* (internal citation omitted).

In order to survive a motion to dismiss based on retaliation for exercising rights under the First Amendment, a plaintiff must allege

> "first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech." *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). The First Amendment protects the rights of speech, to petition for redress, U.S. Const. Amend. I; *United Mine Workers of Am. v. Ill. State Bar Ass'n*, 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967), and to photograph police activities, *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000). <u>To establish a causal connection, the plaintiff must allege that the protected conduct was the "motivating factor behind the defendants' actions.</u>" *Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008).

*Abella v. Simon*, 482 F. App'x 522, 523 (11th Cir. 2012) (emphasis added).

Like the plaintiffs in *Smith* and *Abella*, Ms. Armstrong fails to plausibly allege that her exercise of her First Amendment rights - namely, her filming of the checkpoint proceedings - was the "motivating favor" behind her arrest. She first turned on her video camera at some point in time after the vehicle was stopped, and she continued filming during the course of Mr. Armstrong's arrest without interruption by Captain Hempel or any of the other officers present at the scene. Not until she physically attempted to prevent Captain Hempel from towing the car was Ms. Armstrong, after being given the opportunity to gather her video camera and other belongings into her handbag, ordered out of the vehicle and arrested.

Her handbag was then taken to the police station and searched, and her video camera was confiscated as evidence.

Neither Ms. Armstrong's declaration of facts nor the arrest narrative allege that, at any point in time, Captain Hempel or any other officer demanded that she stop recording or prevented her from filming the proceedings. Her assertions that she was actually arrested for recording the traffic stop are belied by the facts as stated in the Amended Complaint, and her conclusory statement that Defendants caused her First Amendment rights to be violated falls short of the burden she bears to plead claims for relief that are more than mere speculation. *See Twombly*, 550 U.S. at 555, 557.

As Ms. Armstrong has failed to show that Captain Hempel's actions deprived her of her constitutional rights, Defendants' Motion is due to be **GRANTED** as to the First Amendment claims alleged in the Amended Complaint.

### iii. Continued Retention of Video Camera

Finally, Ms. Armstrong contends that her rights have been violated by the continued retention of her video camera and prescription medication confiscated on the day of the arrest. *See, e.g.,* (Doc. 46 at 3) ("To this day, property taken from the aggrieved has NOT been restored.").

The Supreme Court has held that when a government official seizes the

property of an individual, no due process violation occurs when an adequate post-deprivation remedy is available. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). *See id.* ("[W]e hold that an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available. For intentional, as for negligent deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy."); *see also Lindsey v. Storey*, 936 F.2d 554 (11th Cir. 1991) (applying Georgia law, no due process violation occurs when state law creates a civil cause of action for wrongful conversion).

Alabama law provides a civil remedy when an owner is deprived of his property. *See* Ala. Code § 6-5-260 ("The owner of personalty is entitled to possession thereof. Any unlawful deprivation of or interference with such possession is a tort for which an action lies"). When faced with a similar property retention claim, another district court within this Circuit determined that § 6-5-260 served as an adequate postdeprivation remedy, precluding a procedural due process claim, for a plaintiff who alleged that municipal police officers seized signs from him in the course of his arrest for disorderly conduct and never

returned his property. *See Bethel v. City of Mobile, Ala.*, 2011 WL 1298130, at *9 (S.D. Ala. Apr. 5, 2011) (Granade, J.).

This Court finds similarly persuasive an opinion by another district court in this Circuit, which dismissed at the 12(b)(6) stage the plaintiffs' Section 1983 claims for continued retention of a pistol confiscated during an arrest because the plaintiffs had access to adequate post-deprivation remedies under Alabama law. *Browning v. City of Wedowee, Ala.*, 883 F. Supp. 618, 623 (M.D. Ala. 1995) (De Ment, J. ) (identifying adequate post-deprivation remedies under Ala. Code § 6-5-260, which "provid[es] a tort remedy for the unlawful deprivation or interference with an owner's possession of personalty," and Ala. Code § 41-9-60,[9] under which "an aggrieved person may file a claim with the state Board of Adjustment to recover damages to property caused by the state of Alabama or any of its agencies").

Therefore, under *Hudson* and its progeny, Plaintiffs have access to adequate post-deprivation remedies under state law and, accordingly, cannot succeed on a

---

[9]  Ala. Code. § 41-9-60 states as follows:

The purpose of this division is to provide a method of payment by the State of Alabama or any of its agencies, commissions, boards, institutions or departments to persons for injuries to person or property or for death occasioned by the State of Alabama or any of its agencies, commissions, boards, institutions or departments where in law, justice, or good morals the same should be paid.

claim that the alleged continued retention of the video phone or the prescription bills violated their procedural due process rights.

### f.   *Unlawful Booking Claims Against Officer Hester*

In Count Eight, Ms. Armstrong asserts Section 1983 claims against Officer Hester for "trespass by way of threat and extortion [deprivation of right to liberty and property]." (Doc. 46 at 25).[10]  In essence, however, she claims Officer Hester violated her constitutional rights when he forced her to provide fingerprints and photographs and required her to answer questions during booking.

Probable cause "provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest." *King*, 133 S. Ct. at 1977 (internal citation omitted). As the Supreme Court has reemphasized,

> [i]n every criminal case, it is known and must be known who has been arrested and who is being tried." *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 191, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004). An individual's identity is more than just his name or Social Security number, and the government's interest in identification goes beyond ensuring that the proper name is typed on the indictment. Identity has never been considered limited to the name on the arrestee's birth certificate. In fact, a name is of little value compared to the real interest in identification at stake when an individual is brought into custody.

---

[10]  The Court has already addressed - and disposed of - Plaintiffs' claims brought pursuant to the Fifth and Ninth Amendments.

. . .

[L]aw enforcement officers bear a responsibility for ensuring that the custody of an arrestee does not create inordinate "risks for facility staff, for the existing detainee population, and for a new detainee." *Florence*, *supra*, at ——, 132 S.Ct., at 1518.

In sum, there can be little reason to question "the legitimate interest of the government in knowing for an absolute certainty the identity of the person arrested, in knowing whether he is wanted elsewhere, and in ensuring his identification in the event he flees prosecution." 3 W. LaFave, Search and Seizure § 5.3(c), p. 216 (5th ed. 2012). To that end, courts have confirmed that the Fourth Amendment allows police to take certain routine "administrative steps incident to arrest—i.e., ... book[ing], photograph[ing], and fingerprint[ing]." *McLaughlin*, 500 U.S., at 58, 111 S.Ct. 1661.

*King*, 133 S. Ct. at 1971-77.

The facts as pled by Ms. Armstrong demonstrate that Officer Hester informed her that she would not be released from custody until she "answered questions and provided fingerprints and photographs." (Doc. 46 at 39). However, fingerprints and photographs fall squarely within the administrative steps expressly permitted by the Fourth Amendment incident to a lawful arrest.[11]

---

[11] Furthermore, to the extent that Ms. Armstrong contends that the Fifth Amendment right against self-incrimination permits her to avoid providing identifying information or fingerprints, she is mistaken. *See, e.g.*, *Hiibel*, 542 U.S. at 190-91 (Fifth Amendment does not protect a defendant from disclosing his or her name); *United States v. Gibson*, 444 F.2d 275, 277 (5th Cir. 1971) ("The taking of fingerprints does not fall within the category of communications or testimony so as to be protected by the Fifth Amendment. The taking of a fingerprint exemplar after arrest without counsel being present does not violate one's Fifth Amendment privilege against self-incrimination or one's Sixth Amendment right to counsel.").

As to the questions posed by Officer Hester to Ms. Armstrong while she was in custody, Plaintiffs have pled no facts alleging that Officer Hempel's questions were anything more than administrative. *See King*, 133 S. Ct. at 1975 (reaffirming that questions which are "reasonably related to the police's administrative concerns" fall outside the protections of *Miranda*). Further, as Defendants point out, Plaintiffs have provided no legal authority for their contentions that the booking process at the jail following their arrests was unlawful.

Accordingly, Ms. Armstrong has failed to state a Section 1983 claim against Officer Hester for unlawful booking procedures, and Defendants' Motion is due to be **GRANTED** as to the claims against Officer Hester in Count Eight.

## g.    *Unlawful Detention Claims*

In Counts Seven and Twelve, Plaintiffs claim that Officer Hester and Officer Scott violated their constitutional rights by not taking them directly a magistrate for a probable cause determination. (Doc. 46 at 24-25, 29-30).

In order to continue to detain an arrestee following a warrantless arrest, the state must obtain a "fair and reliable determination of probable cause" by a judge or magistrate "promptly after [the warrantless] arrest." *Gerstein v. Pugh*, 420 U.S. 103, 125 (1975); *see also Powell v. Nevada*, 511 U.S. 79, 80 (1994) (failing to

conduct a probable cause hearing promptly following a warrantless arrest violates the Fourth Amendment's prohibition on unreasonable seizures).

However, an individual is not entitled to an *immediate* probable cause hearing following a warrantless arrest. *Scruggs v. Lee*, 256 F. App'x 229, 233 (11th Cir. 2007) (citing *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 55 (1991)). Rather, anyone arrested for a crime "without formal process, whether for felony or misdemeanor, is entitled to a magistrate's review of probable cause within 48 hours." *Atwater*, 532 U.S. at 352 (citing *McLaughlin*, 500 U.S. at 55-58); *see also Case v. Eslinger*, 555 F.3d 1317, 1330 (11th Cir. 2009) ("Detention of a suspect <u>beyond</u> forty-eight hours without a determination of probable cause violates an individual's rights under the Fourth Amendment, and if the determination is made <u>within</u> forth-eight hours of arrest, the complaint must prove that his determination was unreasonably delayed.") (emphasis added).[12] The forty-eight hour rule,

---

[12]  The Supreme Court in *McLaughlin* implied that intervening weekends between an arrest and a probable cause hearing do not qualify as "extraordinary circumstances" sufficient to warrant delay for longer than 48 hours:

> [w]here an arrested individual does not receive a probable cause determination within 48 hours, the calculus changes. In such a case, the arrested individual does not bear the burden of proving an unreasonable delay. <u>Rather, the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance</u>. The fact that in a particular case it may take longer than 48 hours to consolidate pretrial proceedings does not qualify as an extraordinary circumstance. <u>Nor, for that matter, do intervening weekends</u>. A jurisdiction that chooses to offer combined proceedings must do so as soon as is reasonably feasible, but in no event later than 48 hours after arrest.

however, is merely the minimum constitutional threshold, and many jurisdictions have chosen to "impose more restrictive safeguards through statutes limiting warrantless arrests for minor offenses." *Atwater*, 532 U.S. at 352 (citing to Ala. Code § 32-1-4, among other state statutes, as one such statutory safeguard).

Plaintiffs allege that Officer Hester and Officer Scott violated Ala. Code §§ 32-1-4[13] and 32-5-310[14] by not taking them immediately to a magistrate for a probable cause determination. Without discussing the plausibility of Plaintiffs' Fourth Amendment unlawful detention claims, Defendants merely argue that Plaintiffs' citations to Title 32 of the Alabama code are improper because these provisions pertain to warrantless arrests for violations of motor vehicle laws. They point out that Plaintiffs were actually arrested for obstructing government operations, which falls under a different section – Title 13 – of the Alabama

---

500 U.S. at 57, 111 S. Ct. at 1661 (emphases added).

[13] Ala. Code 32–1–4 states that "[w]henever any person is arrested for a violation <u>of this provision of this title</u> punishable as a misdemeanor . . .the person arrested, if he or she so desires, shall have a right to an immediate hearing or a hearing within 24 hours at a convenient hour before a magistrate within the county or city where such offense was committed[.]" (emphasis supplied).

[14] Ala. Code § 32–5–310 states that a police officer may make an arrest "without warrant if the offense be committed in his or her presence, and with warrant if he or she does not observe the commission of the offense. If the arrest be made without warrant, the accused may elect to be immediately taken before the nearest court having jurisdiction, whereupon it shall be the duty of the officer to so take him or her."

Code.[15] Defendants also cite to Rule 4.3 of the Alabama Rules of Criminal Procedure, requiring a probable cause determination "without undue delay" and "no later than 48 hours after arrest," to demonstrate that no such violation occurred in this case.[16]

This argument is underdeveloped for two reasons. First, while § 32–1–4 explicitly states that it is limited to "violations of this provision of this title," § 32–5–310's language is not so limited. Defendants have offered no support for their contention that § 32–5–310 does not, in fact, apply to Plaintiffs' arrest, particularly given that a violation of §32–6–9, for failing to present a license to an officer upon request, underlies the probable cause for Mr. Armstrong's obstruction of government operations arrest. Accordingly, Defendants' claim that the Alabama statutory provisions cited by Plaintiffs do not apply to their arrests is

---

[15] *See* Ala. Code §13A–10–2.

[16] Rule 4.3 of the Alabama Rules of Criminal Procedure states that a person arrested without a warrant

> [s]hall be afforded an opportunity to make bail in accordance with Rules 4.3(b) and 4.4. A judge or magistrate in the county of arrest shall determine whether probable cause exists to believe that the defendant committed the charged offense . . . [i]f a probable cause determination is not made by a judge or magistrate <u>without undue delay, and in any event later than forty-eight (48) hours after arrest</u>, then . . . the person should be released upon execution of an appearance bond set in the amount of minimum bond.

Ala. R. Crim. P. 4.3(a)(1)(iii) (emphasis added).

underdeveloped and will not serve as a basis to dismiss Plaintiffs' claims in

Counts Seven and Twelve at this early stage in the litigation.

Moreover, there is a lack of clarity in the Amended Complaint as to exactly

how long Plaintiffs were detained. Ms. Armstrong alleges that she was held "for

about two hours" before her photos and fingerprints were taken. (Doc. 46 at 13).

She does not allege, however, how much time passed between these booking

procedures and when she posted bond and was released. Mr. Armstrong claims

only that he was held "some amount of time" and "until such time as payment was

made in exchange for my freedom." (*Id.* at 17). The arrest narrative is similarly

unavailing, merely stating in conclusion that "both subjects bonded out by posting

a cash bond." (*Id.* at 35).

However, Plaintiffs' allegations that Officers Hester and Scott informed

them that they would have to wait seventy-two hours in order to see a magistrate

are concerning. *See* (Doc. 46 at 13) (claiming Officer Hester told Ms. Armstrong

that she "would have to wait until Tuesday (approximately 72 hours) until [she]

could be taken before a magistrate."); (*Id.* at 16) (asserting that Officer Scott told

Mr. Armstrong that his appearance before a magistrate would "likely not be

possible before Tuesday (3 days future)"). Ms. Armstrong in particular claims that

she posted bond as a direct result of being informed that she would not be able to

54

see a magistrate for three days. (*Id.* at 25).

Neither party has cited, and the Court has not been able to independently find, any binding authority discussing whether the mere threat of detention for longer than forty-eight hours, even if detention for that length of time does not in fact occur, is sufficient to violate the Fourth Amendment.[17] However, when analyzed under the more liberal *pro se* pleading standard, the Court finds that Plaintiffs have alleged sufficient facts, particularly concerning the statements made by Officers Hester and Scott, to survive Defendants' Motion as to their unlawful detention claims.[18] Accordingly, the Motion is due to be **DENIED** as to the Fourth Amendment claims asserted in Counts Seven and Twelve.

### D.    Plaintiffs' State Law Claims Against Defendant Officers

---

[17] In Counts Seven and Twelve, Plaintiffs also vaguely allege that their Sixth Amendment rights were violated by Officers Hester and Scott. Defendants have moved to dismiss any and all claims Plaintiffs have made pursuant to the Sixth Amendment as insufficiently pled. The Court agrees. The "Sixth Amendment contains several rights[.]" *Hardy v. Comm'r, Ala. Dep't of Corr.*, 684 F.3d 1066, 1079-80 (11th Cir. 2012) (dismissing a sixth amendment claim on appeal when the appellant's brief failed to specify which Sixth Amendment right was violated). Plaintiffs have failed to specify which Sixth Amendment right they are referring to, nor do they explain how Officer Hester and Officer Scott were responsible for any alleged violation. Accordingly, Defendant's Motion is due to be **GRANTED** to the extent any of Plaintiffs' claims are brought pursuant to the Sixth Amendment.

[18] Furthermore, as Defendants have not affirmatively asserted a defense of qualified immunity, it would be improper for the Court to *sua sponte* undertake an analysis of whether these comments violated clearly established law. *See Moore v. Morgan*, 922 F.2d 1553, 1557 (11th Cir. 1991) (citing *Gomez v. Toledo*, 446 U.S. 635, 100 S. Ct. 1920, 64 L.Ed.2d 572 (1980)) ("Qualified immunity is an affirmative defense to personal liability that the defendant has the burden of pleading.").

### 1.    *Alleged Violations of the Alabama Constitution*

Plaintiffs have sprinkled allegations throughout their Amended Complaint that Defendants' actions violated the Alabama Constitution. *See, e.g.* Count One (alleging violations of Article I, § 36); Counts Two, Three, Five, and Six (alleging violations of Article I, §§ 5 and 36); and Count Four (alleging violations of Article I, §4).

The Supreme Court of Alabama has noted, however, that there is no authority that "recognizes a private cause of action for monetary damages based on violations of the provisions of the Constitution of Alabama[.]" *Matthews v. Ala. Agric. & Mech. Univ.*, 787 So. 2d 691, 698 (Ala. 2000); *see also Tomberlin v. Clark*, 1 F. Supp. 3d 1213, 1234 (N.D. Ala. 2014) (dismissing state law due process claims at the 12(b)(6) stage for failure to state a claim because "the Alabama constitution does not create a private right of action to sue for monetary damages"); *Kelley v. City of Fairfield, Ala.*, 2015 WL 4229872, at *5 (N.D. Ala. July 13, 2015) (same). Accordingly, to the extent any of Plaintiffs' claims are premised on violations of Alabama constitutional provisions, those claims are due to be **DISMISSED**.

### 2.    *False Arrest and False Imprisonment*

In addition to their Section 1983 false arrest and false imprisonment claims, Plaintiffs' Amended Complaint appears to assert claims of false arrest and false imprisonment sounding in state law. However, like their federal law counterparts, the existence of probable cause defeats state law allegations of false arrest and false imprisonment.

As another district court within this Circuit has recently stated,

> Under Alabama law, the torts of "false arrest" and "false imprisonment" have different elements. *Griffin v. Beasley*, Case No. 2:12–cv–196–WHA, 2012 WL 2339779, at *5 (M.D. Ala. June 19, 2012) (citing *Higgins v. Wal–Mart Stores, Inc.*, 512 So.2d 766 (Ala.1987) ("<u>in a cause of action for false arrest, a plaintiff must prove that the defendant caused him to be arrested without probable cause</u>"), *overruled on other grounds Drill Parts & Serv. Co. v. Joy Mfg. Co.*, 619 So.2d 1280 (Ala. 1993); *Walker v. City of Huntsville*, 62 So.3d 474, 492 (Ala. 2010)(explaining that Alabama Code § 6–5–170 "defines false imprisonment as 'the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty' ")). False imprisonment "includes directly restraining a person as well as threatening force to keep him in place or make him go where he does not wish to go." *Yabba v. Ala. Christian Acad.*, 823 F.Supp.2d 1247, 1251 (M.D. Ala. 2011) (citing *Crown Central Petrol. Corp. v. Williams*, 679 So.2d 651, 653 (Ala. 1996)). <u>Therefore, "a false or unlawful arrest—that is, an arrest without probable cause— will support a false imprisonment claim.</u>" *Exford v. City of Montgomery*, 887 F.Supp.2d 1210, 1229 (M.D. Ala. 2012) (citing *Upshaw v. McArdle*, 650 So.2d 875 (Ala.1994)).

*Bey*, 2015 WL 3839908, at *13 (emphases added).

As previously determined, Plaintiffs themselves have pled facts in their Amended Complaint, through the attached arrest narrative, that demonstrate the

existence of probable cause for their arrests. Accordingly, Plaintiffs' state law false arrest claims fail and are due to be **DISMISSED WITH PREJUDICE**.

Mr. Armstrong's claim[19] of false imprisonment fails for the same reasons. In Count 11, Mr. Armstrong asserts that Captain Hempel's "unlawful enforcement of Federal and State Motor Vehicle and Traffic Codes at the Driver's License Check point caused him to breach his Fiduciary Duty of Trust to one the people [sic] of Alabama and made all his subsequent actions unlawful." (Doc. 46 at 30). Essentially, Mr. Armstrong is premising his false imprisonment claim on the lack of probable cause for his arrest. However, because he has not pled allegations of false arrest sufficient to withstand a Motion To Dismiss, his false imprisonment claim fails and is due to be **DISMISSED**.

### 3.    *Assault and Battery Claims Conceded*

In their response to Defendant's Motion, under the subheading "alleged improper assault and battery claim," Plaintiffs state as follows:

> Claimants included details of assault and battery in the count for false imprisonment (kidnapping by definition) so that all the necessary elements of false imprisonment are presented; At this time, Claimants do not make a separate count for these apparently willful and wanton

---

[19] Only Mr. Armstrong has explicitly brought a claim for false imprisonment. *See* (Doc. 46 at 29-30). However, to the extent that Ms. Armstrong also intended to bring a claim for false imprisonment pursuant to state law, her claim is also due to be **DISMISSED** for the same reasons.

<u>acts</u> of the Wrongdoers, however Claimants reserve their right to pursue
these as separate counts at a later date.

(Doc. 64 at 11). Accordingly, to the extent that any of Plaintiffs' claims could be

construed as claims of assault and battery against Defendants, these claims are due

to be **DISMISSED**.

## VI.   CONCLUSION

For the foregoing reasons, Defendant's Motion To Dismiss is hereby

**GRANTED in part** and **DENIED in part**. The Motion is **GRANTED** as to all

claims brought in Plaintiffs' Amended Complaint (Doc. 46) other than the Fourth

Amendment unlawful detention claims asserted in Counts Seven and Twelve against

Defendants Quentin Scott and Brandon Hester. The Motion is hereby **DENIED** as to

those Fourth Amendment claims asserted in Counts 7 and 12.

As there are no remaining claims pending against Captain Hempel or the City

of Boaz, both parties are due to be **TERMINATED** as party defendants. The

remaining parties, namely Plaintiffs Robin Zak Armstrong and Timothy-Brian

Armstrong and Defendants Brandon Hester and Quentin Scott, are hereby

**ORDERED** to submit a Rule 26(f) report, in accordance with this Court's Uniform

Initial Order (doc. 24), within **fourteen (14)** days of the date of this Order.

**DONE** and **ORDERED** this the 24th day of July, 2017.

**VIRGINIA EMERSON HOPKINS**
United States District Judge